**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ROBYN HOLLINGER, )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Commissioner of Social Security, )<br>)<br>**Defendant.** )<br>_____) | **CIVIL ACTION**<br><br>**No. 13-1468-KHV** |

**MEMORANDUM AND ORDER**

Robyn Hollinger appeals the final decision of the Commissioner of Social Security to deny disability insurance benefits and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1281-1385. For reasons set forth below, the Court finds that the final decision of the Commissioner should be reversed.

**I.      Procedural Background**

On August 9, 2010, plaintiff applied for disability insurance benefits under Title II. On August 24, 2010, she applied for SSI under Title XVI. The agency denied plaintiff's applications initially and upon reconsideration. Tr. 92-123. On September 28, 2012, following a hearing, an administrative law judge ("ALJ") found that plaintiff was not disabled as defined in the Social Security Act. Tr. 10-33. On November 8, 2013, the Appeals Council denied plaintiff's request for review. Tr. 1-6. The ALJ decision thus stands as the final decision of the Commissioner. See U.S.C. §§ 405(g), (h). Plaintiff appealed to this Court the final decision of the Commissioner.

**II.     Facts**

The following is a brief summary of the evidence presented to the ALJ.  The Court explores some of the facts in greater detail in the analysis section.

**A.     Medical Evidence**

In September of 2001, plaintiff saw Dr. Frederick Wolfe, M.D., for a consultation regarding her history of intractable generalized pain and associated symptoms including sleep disturbance, fatigue, anxiety, depression and feelings of helplessness.  Dr. Wolfe diagnosed dysfunctional pain syndrome.  He also noted that plaintiff was 125 pounds overweight and recommended weight loss and exercise and psychological intervention for her pain.[1]  Dr. Wolfe found that plaintiff had some restriction of movement and joint space narrowing in her left hip.  She had all tender positive points. Tr. 455.

On December 16, 2008, Nurse Practitioner Traci Harsch, ARNP, examined plaintiff at the Shawnee County Health Agency.  Tr. 370.  Plaintiff reported fatigue, weakness, pain, myalgia and anxiety.  Harsch noted that plaintiff's speech was slow, and that she appeared withdrawn and agitated.  She assessed plaintiff with fibromyalgia, anxiety and depression.  Plaintiff signed a narcotic contract for pain medication.

A month later, plaintiff reported a severe flare-up of fibromyalgia.  Harsch noted that plaintiff had palpable tenderness and spasm in her neck and back, and prescribed gabapentin.  Tr. 368.

On February 18, 2010, plaintiff reported to Harsch that she was doing pretty well but continued to experience fatigue, weakness, pain, headache and myalgia.  She had stopped taking

---

[1]     Plaintiff later underwent gastric bypass and lost significant weight.

gabapentin because it did not help her pain and made her sleepy. Harsch prescribed Effexor and Lortab.

On July 23, 2010, Harsch wrote a letter stating that plaintiff needed a service dog due to fibromyalgia, degenerative joint disease and hearing loss. Tr. 485.

On September 10, 2010, plaintiff reported fluctuations in her blood pressure, as well as continued fibromyalgia pain, which she rated ten on a scale of one to ten. Tr. 414. She reported racing thoughts and anxiety. Harsch prescribed Flexeril and Klonipin.

On November 30, 2010, Harry Hilderman, AUD, evaluated plaintiff's hearing. Plaintiff reported a history of ear infections and tinnitus in both ears. Dr. Hilderman diagnosed mild to moderate sensorineural hearing loss which would affect her ability to understand soft-spoken words or speech in noisy environments. Tr. 378.

On December 4, 2010, Dr. Jay Hughey evaluated plaintiff on referral from Disability Determination Services. Tr. 383. Dr. Hughey noted that plaintiff had difficulty rising from a seated position, hopping and squatting. He found that she had five fibromyalgia paired trigger points. He determined that she had an unimpaired ability to walk with normal range of motion in all joints. He concluded that plaintiff had a history of arthralgias and fibromyalgia.

On March 24, 2011, Dr. Magdalene Kovach conducted a consultative psychological evaluation of plaintiff. Plaintiff reported that she had received intermittent treatment for depression and anxiety and that anti-depressants had not helped her. Plaintiff appeared very serious and rarely smiled but had normal speech and adequate eye contact. Dr. Kovach found that plaintiff had normal memory and clear thinking but below average problem-solving and judgment skills possibly affected by impulsiveness. She diagnosed plaintiff with depressive disorder and passive aggressive

personality features. Dr. Kovach opined that plaintiff could understand and follow simple directions, that plaintiff's work history suggested problems with consistency and reliability, that her motivation to work was low and affected by depression and medical issues, and that her judgment was affected by resentment and a cynical view of others. Tr. 391.

On October 11, 2011, plaintiff reported to Harsch that her Effexor was not working; she was feeling tired and having headaches and muscle aches due to weather, arthralgias, worsening muscle cramps, anxiety, high irritability, depression, sleep disturbances and anhedonia. Nurse Harsch prescribed Viibryd. Tr. 428. The next month, plaintiff reported that Viibryd was working well, but she that was anxious. Plaintiff requested an increased dose of Klonipin.

On November 21, 2011, Harsch completed a Medical Source Statement-Physical in which she opined that plaintiff had the following limitations: she could lift and/or carry less than five pounds frequently and five pounds occasionally; stand and/or walk continuously for less than 15 minutes and for one hour total in an eight hour day; limited ability to push and pull; never climb, balance, stoop, kneel, crouch, crawl or reach; avoid moderate exposure to extreme cold and heat, weather, wetness, humidity, dust, fumes, vibration, hazards and heights; and lie down or recline to relieve pain. She opined that plaintiff's pain and medications caused her to have decreased concentration. Tr. 423-24.

On January 6, 2012, plaintiff began seeing Karen Bruce, M.D.[2] Dr. Bruce assessed rheumatism, lumbosacral spondylosis, cervical spondylosis, migraine, headache, chronic pain and fibromyalgia. She increased plaintiff's dose of clonidine. Tr. 434.

---

[2] The Shawnee County Health Agency stopped treating plaintiff due to an incident with her service dog. Tr. 426-27.

On April 13, 2012, plaintiff told Dr. Bruce that she was experiencing dizziness and forgetfulness, anxiety, depression and chronic pain. Tr. 449-50. Dr. Bruce prescribed tramadol and morphine. Tr. 451-52. On May 1, 2012, Dr. Bruce prescribed a wheelchair. Tr. 437.

On May 2, 2012, plaintiff reported that her medications made her drowsy and that she was erratic on morphine. She also reported increased falls. Plaintiff's husband reported that she was sleeping more, was confused, had poor tracking, was not eating normally and required more care from him. Tr. at 446. Dr. Bruce discontinued the morphine and started plaintiff on Butrans. Tr. 447. On June 1, 2012, plaintiff told Dr. Bruce that she could not afford Butrans. At that visit, she had improved gait and walked with a cane.

On June 5, 2012, Richard Shapiro, Ph.D. examined plaintiff. Plaintiff reported that she was sleeping poorly and spent most of her days at home reading and watching television. Dr. Shapiro diagnosed cognitive disorder, dysthymic disorder and personality disorder. He assessed a Global Assessment of Functioning ("GAF") score of 35, and noted that plaintiff's difficulty with testing appeared to stem from medications or identity diffusion.

On June 20, 2012, plaintiff reported to Dr. Bruce that she had pain in her hips, back, left shoulder and left ribs which was not completely alleviated by fentanyl. She was drowsy when sedentary and "fuzzy-headed" at other times. Tr. 471. Dr. Bruce lowered the gabapentin dose to reduce side effects. On July 19, 2012, plaintiff reported severe burning in both knees, headaches, increased pain in her left shoulder and tingling in her fingers. She was not driving because her medications made her sleepy. Tr. 465-66. She reported that her depression and memory had improved, but Dr. Bruce noted that her mood and affect were still depressed. Tr. 467.

On September 4, 2012, Dr. Shapiro opined that plaintiff had moderate limitations in seven

areas of mental functioning and marked limitations in six areas. He stated that plaintiff was extremely limited in her ability to complete a normal workday or workweek without interruption from psychological symptoms and to perform at a consistent pace without numerous rest periods. Tr. 483.

### B. Plaintiff's Testimony

On September 17, 2012, the ALJ held a hearing at which plaintiff testified as follows:

In April of 2009, plaintiff quit her job at the Veteran's Administration because the stress exacerbated her fibromyalgia and the job required her to sit constantly at her desk. Tr. 42. Plaintiff's condition worsened in September of 2011 and since then she has been largely bedridden. She is unable to work because of pain and medications which make her drowsy and cause her to fall asleep. She takes her medications in the morning and then goes back to sleep for a few hours. When her children come home from school she spends time with them or helps them with their homework. Plaintiff needs help with activities of daily living, including getting to the bathroom and showering. Tr. 44. Her husband and children do all of the housework. For the past six months she has used a wheelchair when she goes out. Tr. 43. She goes grocery shopping once a month in her wheelchair.

The last year was very difficult because of "the stress associated with trying to get to the doctor's appointments for Social Security." Tr. 47. Plaintiff explained as follows:

> My husband and I had a lot of issues with my illness and going through and doing everything that's required for Social Security. There's a lot of arguments in the house right now because of the different – the things I'm not able to do anymore, you know, like get up and fix a meal for my kids, you know.

Tr. 48.

### C. Vocational Expert Testimony

The ALJ proposed the following hypothetical to the vocational expert: an individual of claimant's age, education and work experience, who is limited to sedentary exertional work, allowing for alternating sitting and standing positions every 30 minutes at the work station; no ladders, ropes or scaffolds; occasional ramps and stairs; occasional balance, stoop, kneel, crouch and crawl, with the need to avoid concentrated exposure to excessive noise; doing simple, routine repetitive tasks; occasional decision-making; and occasional changes in the work setting; no interaction with the public, occasional interaction with co-workers and occasional supervision. The vocational expert testified that an individual with these limitations would not be able to perform plaintiff's past relevant work, but could work as a document preparer, optical goods assembler or wire patcher. Tr. 54. The vocational expert testified that if this individual needed to use a wheelchair, an accommodated work station would be needed.

### III. ALJ Findings

In her order of September 28, 2012, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since April 10, 2009, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: lumbosacral and cervical spondylosis, rheumatism, depression, a personality disorder, a memory disturbance, a cognitive disorder, chronic pain, fibromyalgia, and hearing loss (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpat1 P, Appendix 1 (20 CFR 404.1520(d), 404.1525,404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that she can lift and carry 10 pounds occasionally and frequently. The claimant is able to stand and walk for 2 hours in an 8-hour day and sit for 6 hours in an 8-hour day. However, the claimant must be able to sit and stand every 30 minutes. The claimant is unable to climb ladders, ropes, and scaffolds. But, she retains the ability to occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to excessive noise, but she can work in environments with moderate noise levels. Mentally, the claimant is limited to simple, routine, and repetitive tasks involving only occasional decision making and occasional changes in the work setting. The claimant can tolerate occasional interaction with coworkers and supervisors. However, she is unable to tolerate jobs that require interaction with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 14, 1978 and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 10, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

### IV. **Standard Of Review**

The Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009);

see 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Wall, 561 F.3d at 1052; Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires more than a scintilla, but less than a preponderance. Wall, 561 F.3d at 1052; Lax, 489 F.3d at 1084. Whether the Commissioner's decision is supported by substantial evidence is based on the record as a whole. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994). Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion. Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005). To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will meticulously examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

**V.    Analysis**

Plaintiff bears the burden of proving disability under the Social Security Act. Wall, 561 F.3d at 1062. Plaintiff is under a disability if she can establish that she has a severe physical or mental impairment which prevents her from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least 12 months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). In the first three steps, the Commissioner determines (1) whether claimant has engaged in substantial gainful activity since the alleged onset, (2) whether she has a severe impairment or combination of impairments and (3) whether the severity of any impairment

is equivalent to one of the listed impairments that are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(c), (d); see Williams, 844 F.2d at 750-51. If claimant satisfies steps one, two and three, she is automatically found disabled. If claimant satisfies steps one and two but not three, the analysis proceeds to step four.

At step four, the ALJ makes specific findings of fact at three phases: (1) the individual's RFC, (2) the physical and mental demands of prior jobs or occupations and (3) the ability of the individual to return to the past occupation given her RFC. Winfrey v. Chater, 92 F.3d 1017, 1023-25 (10th Cir. 1996). If the claimant satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. Jensen v. Barnhart, 436 F.3d 1163, 1168 (10th Cir. 2005); see 20 C.F.R. § 404.1520(a)(5).

Plaintiff claims that the ALJ erred at step four in weighing the medical opinions and evaluating her credibility to formulate her RFC. Plaintiff asserts that based on the erroneous RFC, the ALJ erred at step five in finding that she is capable of performing work that exists in the national economy.

Plaintiff claims that the ALJ did not properly weigh the medical opinions. Specifically, she asserts that the ALJ (1) gave too little weight to the opinion of nurse practitioner Harsch and (2) gave too much weight to the opinion of examining physician Dr. Hughey and non-examining state agency medical sources Carl Leigh, M.D., and Emil Goring, M.D.[3] The Commissioner argues that the ALJ properly discounted Harsch's opinion as inconsistent with other record evidence.

---

[3] Plaintiff also asserts that the ALJ gave too little weight to the opinion of examining source Richard Shapiro, Ph.D. and assigned too much weight to the opinion of examining source Magdalene Kovach, Ph.D. and state agency sources Robin Reed, M.D. and David Biscardi, Ph.D. The Court does not reach these issues.

Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments including claimant's symptoms, diagnosis and prognosis. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A treating physician's opinion about the nature and severity of claimant's impairments should be given controlling weight by the Commissioner if well supported by clinical and laboratory diagnostic techniques and if not inconsistent with other record evidence. Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003); 20 C.F.R. § 404.1527(d)(2). If an ALJ decides not to give controlling weight to a treating physician opinion, the ALJ must give reasons for the weight which she gives the treating source. Newbold v. Colvin, 718 F.3d 1257, 1265 (10th Cir. 2013).

Even if an opinion of a treating medical source is not entitled to controlling weight, the ALJ must weigh the opinion in light of the factors set forth at 20 C.F.R. § 404.1527. Id. Those factors are as follows: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the source's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the source is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ attention which tend to support or contradict the opinion. Watkins, 350 F.3d at 1301; 20 C.F.R. §§ 404.1527(d)(2-6), 416.927(c)(2-6).

The opinion of a non-treating source who only examined claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. Doyal v. Barnhart, 331 F.3d 758, 762-63 (10th Cir. 2003). Further, the opinions of *non-examining* sources are generally entitled

to even less weight than the opinions of non-treating sources. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004). Nonetheless, the ALJ must evaluate every medical opinion, and must provide provide specific, legitimate reasons for rejecting a medical source opinion. See Doyal, 331 F.3d at 764.

On December 4, 2010. Dr. Hughey performed a detailed physical examination of plaintiff See Ex. 5F. He noted that plaintiff had an unimpaired ability to walk with normal range of motion in all joints. Plaintiff demonstrated good grip strength and normal neurological functioning. She had difficulty hopping and mild difficulty in squatting. See Ex. 6F. Dr. Hughey noted that plaintiff could hear normal speech without difficulty. Id.

In February and March of 2011, respectively, Drs. Leigh and Goring reviewed plaintiff's medical records. They each opined that plaintiff could perform light work which required lifting 10 pounds frequently and 20 pounds occasionally, and sitting, standing or walking for six hours of an eight-hour day, with frequent climbing of stairs and ramps, occasional climbing of ropes, ladders or scaffolds, and no manipulative limitations. Tr. 21, 83-104.

On November 21, 2011, Harsch opined that plaintiff was limited to lifting or carrying less than five pounds frequently and five pounds occasionally, standing and/or walking continuously for less than 15 minutes and for one hour total in an eight hour day and would need to lie down or recline every hour to relieve pain. She opined that plaintiff's pain and medications caused her to have decreased concentration. Tr. 424.

As the ALJ recognized, Social Security Ruling ("SSR") 06-03p provides the procedure for evaluating the opinions of medical sources (such as Harsch), who are not "acceptable medical sources." See SSR 06-03p, 2006 WL 2329929 (Aug. 9, 2006). In SSR 06-03p, the Commissioner

noted as follows:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. at *3. SSR 06-03p explains that the ALJ should evaluate opinions from these sources using the factors for evaluating medical opinions. Further, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. at *6; see also Frantz v. Astrue, 509 F.3d 1299, 1302 (10th Cir. 2007) (remanding for consideration of nurse-practitioner opinions in light of SSR 06-03p).

Here, the ALJ provided four reasons for discounting Harsch's opinion: (1) as a nurse practitioner, Harsch is not an acceptable medical source; (2) Harsch's opinion that plaintiff needed to recline every hour was inconsistent with detailed findings of Dr. Hughey, (3) progress notes do not support Harsch's opinion, and (4) Harsch's finding that plaintiff could not work is not supported by objective evidence.

Plaintiff contends that in evaluating Harsch's opinion, the ALJ failed to acknowledge that her condition deteriorated after September of 2011. She points out that Dr. Hughey examined her in December of 2010, almost a year before Harsch provided her opinon. The ALJ acknowledges that plaintiff testified that her condition deteriorated after September of 2011, but found that her

-13-

testimony was not credible, because "nothing medically significant" had occurred after September of 2011. Further, the ALJ found that plaintiff had no medical need for a wheelchair – even though Dr. Bruce, a treating physician, prescribed one on May 1, 2012. The ALJ stated that plaintiff is not morbidly obese and that no objective tests of any joint or spine support the need for a wheelchair. The ALJ noted that on January 6, 2012, Dr. Bruce found that plaintiff had normal stability in her gait. The fact that plaintiff had no joint, gait or spinal dysfunction in January of 2012, however, does not compel the conclusion that plaintiff had no medical need for a wheelchair several months later.

The Court's overriding concern is that the ALJ discounted the opinons of Harsch and Dr. Bruce, as well as the credibility of plaintiff's testimony, because of a lack of "objective" medical evidence. Symptoms of fibromyalgia, however, are entirely subjective; no laboratory tests can identify its presence or severity. Wilson, 602 F.3d at 1143 (when record contained diagnoses of chronic pain syndrome or fibromyalgia, complaints of severe pain do not readily lend themselves to analysis by objective medical tests); Gilbert v. Astrue, 231 F. App'x. 778, 783-84 (10th Cir. Apr. 11, 2007) (lack of objective test findings not determinative of severity of fibromyalgia); Brown v. Barnhart, 182 F. App'x. 771, 773 (10th Cir. May 25, 2006); see Priest v. Barnhart, 302 F. Supp.2d 1205, 1213 (D. Kan. 2004) (fibromyalgia diagnosed by ruling out other diseases through medical testing; absence of objective medical test to diagnose fibromyalgia cannot support conclusion that claimant does not suffer from potentially disabling condition). As the case law makes clear, the lack of "objective" medical evidence is not determinative of the severity of fibromyalgia. It is error for the ALJ to discount plaintiff's allegations of limitations due to fibromyalgia because of the lack of objective medical evidence. See Gibbs v. Colvin, No. 11-1318-SAC, 2013 WL 823412, at *3-4 (D. Kan. Mar. 6, 2013). It appears that despite the diagnosis of fibromyalgia, the ALJ improperly

discounted Harsch's opinions in large part because of the lack of objective medical evidence. The Court therefore reverses and remands for the Commissioner to reevaluate the medical opinions in light of the diagnosis of fibromyalgia and the case law set forth above governing the consideration of fibromyalgia.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C § 405(g) reversing the Commissioner's decision and **REMANDING** for further proceedings in accordance with this memorandum and order.

Dated this 21st day of May, 2015, at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge